FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2014 DEC 29  AM 9: 32

CLERK _____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
BRUNSWICK DIVISION

DEREK COLLINS and      *
TONY SHEPPARD      *
     *
      Plaintiffs,      *
     *
    v.      *       CV 213-052
     *
OKEFENOKE RURAL ELECTRIC      *
MEMBERSHIP CORPORATION,      *
     *
      Defendant.      *

## O R D E R

This matter is now before the Court on Defendant Okefenoke Rural Electric Membership Corporation's ("OREMC") Motion for Summary Judgment. (Doc. 25.) Plaintiffs Derek Collins and Tony Sheppard assert that OREMC terminated them from their positions as foremen on the basis of their age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* For the reasons set forth below, the Court **GRANTS** OREMC's Motion for Summary Judgment.

### I. BACKGROUND

As a preliminary matter, Plaintiffs have failed to respond appropriately to OREMC's Statement of Material Facts ("DSMF") (Doc. 27), which complicates this Court's and OREMC's tasks. Pursuant to Local Rule 56.1, "[e]ach statement of material fact shall be supported by a citation to the record." LR 56.1, *SDGa.* In only 5 of 32 denials did Plaintiffs make any reference to the

record (see Pls.' Statement of Material Facts ("PSMF"), Doc. 45, ¶¶ 6, 26, 28, 29, 31), and despite appending factual argument to another 17 paragraphs of admissions, Plaintiffs only referenced the record two more times (see PSMF ¶¶ 3, 20). The Local Rules also mandate that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted *unless controverted* by a statement served by the opposing party." LR 56.1, SDGa (emphasis added). Here, Plaintiffs' filing is replete with extraneous and wholly unresponsive information. For instance, in paragraph 24, OREMC states, "On December 6, 2011 [Mr. Collins] was involved in another incident at Harriet's bluff where a live electrical line hit a work truck and the electrical charge passed through the truck and burned its tires." (Def.'s Statement of Material Facts ("DSMF"), Doc. 27, ¶ 24.) Plaintiffs respond "that incidents do occur when working with electrical power and that, fortunately, most of the time there are no injuries and no property damage. The fact that these 'incidents' . . . occur does not mean that anyone is negligent or at fault or casual about safety in any way." (PSMF ¶ 24.) In another example, Plaintiffs' counsel denies Royce Proctor's and Mr. Collins' own testimony that OREMC implemented new grounding procedures, but then adds argument that the new procedure was "more dangerous" and "a failed experiment" that has since been discontinued. (DSMF ¶¶ 28, 29; PSMF ¶¶ 28, 29.)

The purpose of discovery is for each party to be able to get all of its facts on the table. Summary judgment is then

2

briefed based on that set of facts. The Statement of Material Facts essentially is a restatement of each party's position, but nevertheless a valuable tool in the face of a voluminous record, as is the case here. More importantly, it is required: after all, it is not the Court's duty to comb the record to find reasons to deny summary judgment. BFI Waste Sys. v. DeKalb Co., 303 F. Supp. 2d 1335, 1342 (N.D. Ga. 2004) (citation omitted); see also Tomasini v. Mt. Sinai Med. Ctr. of Fla., Inc., 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004). Plaintiffs' deficient responses to clear and unobjectionable factual statements are troubling, and in so responding, Plaintiffs have done little to advance their case. Thus, for purposes of this motion — and especially the factual background herein recited — the Court accepts as true the facts contained in OREMC's Statement of Material Facts so long as they are supported by the evidence, do not make credibility determinations, and do not involve legal conclusions. E.E.O.C. v. Atlanta Gastroenterology Assocs., LLC, 2007 WL 602212, *3 n.2 (N.D. Ga., Feb. 16, 2007).

### A.    Mr. Collins' Employment & Disciplinary History

#### 1.    *Summary*

OREMC hired Mr. Collins as a meter reader in 1991, and he received promotions through the ranks in 1993, 1995, 1999, and the early 2000s. (DSMF ¶¶ 1, 2; PSMF ¶¶ 1, 2.) Six to eight years later, OREMC promoted Mr. Collins to foreman. (DSMF ¶ 3;

PSMF ¶ 3.)  As a foreman, Mr. Collins led a team of electrical workers that built power lines to houses and replaced existing lines.  (DSMF ¶ 3; PSMF ¶ 3; Collins Dep., Doc. 29, at 26-29.) One of his primary duties was to maintain the safety of his crew. (DSMF ¶ 3; Collins Dep. at 28; Sheppard Dep., Doc. 30, Ex. 7 ("Job Description"), § III.A.13.)  Indeed, Mr. Collins attended safety briefings daily while he was a foreman, and in 2011, he received and signed an acknowledgment for OREMC's safety manual. (DSMF ¶¶ 16, 17; PSMF ¶¶ 16, 17.)

OREMC notified Mr. Collins in March 2012 that his employment was being terminated for a safety violation.  (DSMF ¶ 4; PSMF ¶ 4.)  At that time, he was 41 years old.  (DSMF ¶ 5; PSMF ¶ 5.) There were four individuals in Mr. Collins' chain of command at the time of his termination.  Mr. Proctor, who is 52 years old, was the Supervisor of Construction for Kingsland and Mr. Collins' immediate supervisor throughout his tenure as a foreman.  (DSMF ¶¶ 6, 7; PSMF ¶ 7; Collins Dep. at 29-30.)  Danny Thornton was above Mr. Proctor in the chain of command and is at least 20 years older than Mr. Collins.  (DSMF ¶ 9; PSMF ¶ 9.)  Travis Page, who is now 44, replaced Mr. Thornton as Operations Manager while Mr. Collins' termination was in progress.  (DSMF ¶¶ 10, 13; PSMF ¶¶ 10.)  John Middleton, who is 50, served as OREMC's General Manager.  (DSMF ¶ 11.)

It appears that the majority of Mr. Collins' interaction with the management team was through Mr. Proctor, with whom he had an "amicable working relationship." (DSMF ¶ 14; PSMF ¶ 14.) Nevertheless, there was considerable tension between Mr. Collins and Mr. Proctor: "voices would be raised" and Mr. Collins complained to management about Mr. Proctor's supervision. (Id.) In January 2012, only months before Mr. Collins' termination, an incident occurred in which Mr. Proctor allegedly put his hands on Mr. Collins when he attempted to walk away from a heated discussion. (Id.; Collins Dep. at 33-35 & Ex. 8.)

## 2. *Safety & Discipline*

Four years before OREMC terminated Mr. Collins, Mr. Thornton issued Mr. Collins a Last Chance Agreement ("LCA"). (DSMF ¶ 18; Collins Dep. Ex. 3 ("Collins LCA").) On or about March 18, 2008, Mr. Collins directed certain employees to place updated inspection tags on equipment that, in fact, had not been tested recently. (Collins LCA at 1, ¶¶ 1-3.) Mr. Collins then lied to an inspector about the suspicious tags, but later admitted to being untruthful after being confronted with contradictory evidence from witnesses. (Id. ¶ 2.) Mr. Collins' LCA also cited him for openly criticizing members of management and creating a hostile "you're with them or us" work atmosphere. (Id. ¶ 4.) The LCA, which Mr. Collins ultimately signed, imposed a

suspension without pay and was effective for one year. (Id. at 3, ¶¶ 5, 9.)

In September 2011, OREMC documented an incident between Mr. Collins and Jimmy Spence. (Collins Dep., Ex. 4.) Apparently there was dispute as to which truck each party would use that day, and Mr. Collins — in front of other employees — "told Jimmy *he could not take [the] truck*" and "hollered at him that if he had a problem he could talk to Royce." (Id.) Although Mr. Collins contends he yelled merely so that he could be heard over the truck's diesel engine (Collins Dep. at 45, 97-98), a supervisor later advised Mr. Collins that the way he handled the situation was unacceptable and that "he was to treat all the men with respect at all times" (id., Ex. 4). In November 2011, Mr. Proctor documented another safety incident in which Mr. Collins failed to post road signs because they were on another foreman's truck. (Id. at 46-47, 96-98; Ex. 5.) On December 6, 2011, Mr. Collins' crew was involved in an incident at the Harriet's Bluff worksite where a live electrical line hit a work truck, passed *its charge, and burned the truck's tires.* (Id. Ex. 6; DSMF ¶ 24.) OREMC shut down the worksite for several months after this incident to try a new grounding procedure. (DSMF ¶ 25.) On January 6, 2012, Mr. Proctor cited Mr. Collins for his failure to wear a traffic vest, though Mr. Collins asserts he only temporarily removed the vest to take off or put on his jacket.

(DSMF ¶ 26; Collins Dep. at 53.) A couple weeks later on January 18, 2012, OREMC issued Mr. Collins a suspension for a separate failure to properly install traffic control signs. (DSMF ¶ 27; Collins Dep., Exs. 7 & 8.) Mr. Collins contends that the mismatched signage was a simple mistake and that the suspension was a retaliatory attempt to cover up Mr. Proctor's own bad behavior, namely grabbing Mr. Collins during a disagreement. (Collins Dep., Ex. 8.)

Finally, on or about March 15, 2012, OREMC reopened the Harriet's Bluff worksite. (DSMF ¶ 28; PSMF ¶ 28.) That same day, a member of Mr. Collins' crew, Martin Andrew "Andy" Thomas, committed an error while maneuvering the bucket and contacted a 14,000 volt live electrical wire, which caused a service disruption to 1,400 customers. (DSMF ¶ 31; Page Dep., Doc. 31, at 32.) Moreover, the crew did not ground the bucket truck according to OREMC's policy and common procedure, instead barricading it with cones, and a police officer was on site to direct traffic. (DSMF ¶ 30; Collins Dep. at 62; Sheppard Dep., Ex. 10, ¶ 7.) Following this incident, OREMC interviewed all workers involved and conducted an investigation alongside union representatives. (DSMF ¶ 33; PSMF ¶ 33.) In the end, the investigation committee concluded that Mr. Collins, as the foreman on site, "failed to recognize all the associated hazards and to minimize [his crews'] exposure to th[o]se hazards."

7

(Collins Dep. Ex. 10, at 8 ("Fact Sheet Contract Investigation").) Specifically, the committee pointed out that the energized line at issue could have been covered with rubber hoses or deenergized, or the truck itself could have been repositioned to give the bucket more clearance of the line. (Id.) Mr. Collins admits that he was the foreman on site that day, that the incident could have been life threatening, and that customers lost power as a result, but he denies that he committed any safety violation. (DSMF ¶¶ 34, 35; PSMF ¶ 35.) In response to this incident, Mr. Proctor, Mr. Page, and Mr. Middleton reviewed Mr. Collins' record and ultimately decided disciplinary action was necessary. (DSMF ¶¶ 36-39.) OREMC first suspended Mr. Collins pending further investigation, but Mr. Page subsequently issued a termination notice. (Collins Dep., Exs. 9 & 10.) Mr. Collins filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and received a Notice of Right to Sue. (Compl., Doc. 1, ¶ 11.)

### B. Mr. Sheppard's Employment & Disciplinary History

#### 1. *Summary*

OREMC hired Mr. Sheppard as a meter reader in 1987, and he received promotions through the ranks in 1991, 1993, and 1997. (DSMF ¶ 41; PSMF ¶ 41.) OREMC later promoted Mr. Sheppard to foreman. (Id.) Like Mr. Collins, one of Mr. Sheppard's primary duties was to maintain the safety of his crew. (DSMF ¶¶ 43-45;

PSMF ¶¶ 43-45.)    Also like Mr. Collins, Mr. Proctor and Mr. Thornton served as Mr. Sheppard's supervisors over the course of his career.    (DSMF ¶ 42; PSMF ¶ 42.)    It likewise appears that Mr. Sheppard experienced some tension with Mr. Proctor, as Mr. Sheppard was willing to "confront" him on behalf of other employees about safety and other job-related issues.    (Sheppard Dep. at 23-25.)    Mr. Sheppard felt that Mr. Proctor "looked down on [the employees]" and that the employees respected him more than Mr. Proctor.    (Id. at 23-24.)

OREMC notified Mr. Sheppard in early April 2012 that his employment was being terminated for safety issues and insubordination.    (Sheppard Dep., Ex. 9.)    At the time of his termination, he was 47 years old.    (DSMF ¶ 65; PSMF ¶ 65.)

### 2.  *Safety & Discipline*

Four years before OREMC terminated Mr. Sheppard, Mr. Thornton issued Mr. Sheppard a Last Chance Agreement ("LCA"). (DSMF ¶ 46; Sheppard Dep. Ex. 6 ("Sheppard LCA").)    On or about March 18, 2008, Mr. Sheppard directed certain employees to place updated inspection tags on equipment that, in fact, had not been recently tested.    (Sheppard LCA at 1, ¶¶ 1-3.)    Unlike Mr. Collins, Mr. Sheppard admitted his misconduct during OREMC's initial investigation.    (Id. ¶ 2.)    Mr. Sheppard's LCA also cited him for openly criticizing members of management and creating a hostile "you're with them or us" work atmosphere.    (Id. ¶ 4.)

Mr. Sheppard denies he acted in this way. (DSMF ¶ 48; PSMF ¶ 48.) Mr. Sheppard ultimately signed the LCA, however, and OREMC imposed a suspension without pay. (Id. at 3, ¶¶ 5, 9.)

On December 6, 2011, Mr. Sheppard's crew was also involved in the incident at Harriet's Bluff whereby a live electrical line hit a work truck and burned the truck's tires. (DSMF ¶ 48; PSMF ¶ 48.) Steve Wynn, who reported to Mr. Sheppard, was the lineman in the bucket when "the tail [of a wire] [got] away from him," "flopping over eight [feet] away" to a hot line. (Collins Dep. at 49-50.) Mr. Sheppard's crew was also involved in the second live contact incident at Harriet's Bluff on March 15, 2012. (DSMF ¶ 51; PSMF ¶ 51.) During the investigation of the second Harriet's Bluff incident, OREMC discovered that Mr. Sheppard conducted the safety "tailgate" with his crew at a nearby store instead of at the worksite such that details of the site's environment could not be assessed properly — for example, traffic conditions, "anything else specific to that geographic location," etc. (Page Dep. at 24-29, 33.) OREMC also perceived Mr. Sheppard's explanation of the day's mishaps to be inconsistent with those of the other crew members present. (Page Dep. at 32-33, 58-62; Proctor Dep., Doc. 32, at 49-50; Sheppard Dep., Ex. 9 at 6, 9.) The management team ultimately decided that Mr. Sheppard either lied during the post-incident interviews or he had not paid attention to the work being done on the day of the

incident such that he could offer a truthful answer at all. (Id.)

As with Mr. Collins, OREMC disciplined Mr. Sheppard following the March 2012 incident. (DSMF ¶ 50; PSMF ¶ 50.) Initially, OREMC imposed a suspension and instructed Mr. Sheppard to return to work on Friday, March 30, 2012. (DSMF ¶¶ 54, 55; PSMF ¶ 54.) Mr. Sheppard in turn responded that he would not return to work on Friday, but would wait until the following Monday. (DSMF ¶ 55; Proctor Dep. at 51-52; Sheppard Dep. at 57-58.) He wished to use one day of his eight accrued weeks of leave to enjoy his daughter's full spring break and believed the aforementioned statement to Mr. Proctor served as adequate notice under OREMC's practice of informally arranging leave with a direct supervisor. (Sheppard Dep. at 58-59; see also Middleton Dep., Doc. 35, at 38-39.) Mr. Proctor and Ronnie Crews, OREMC's head of human resources, reported Mr. Sheppard's response to Mr. Middleton. (Middleton Dep. at 38-40.) Mr. Crews was surprised that Mr. Sheppard would not return when told having just been reprimanded. (Crews Dep., Doc. 36, at 5-6, 44-45.) Mr. Sheppard did not report to work on March 30, 2012. (Sheppard Dep. at 57-58.) According to Mr. Middleton and Mr. Page, Mr. Sheppard would not have been fired had he returned to work as requested. (Middleton Dep. at 38, 70-72 ("[Mr. Sheppard] was terminated for insubordination for failure to report back to work on the day he

was told to report back to work following a suspension resulting from disciplinary infractions."); Page Dep. at 43-44.) Mr. Sheppard filed his complaint with the EEOC on September 25, 2012, and received a Notice of Right to Sue on or about January 9, 2013. (Sheppard Dep., Exs. 3, 4; Collins Dep., Ex. 13.)

### C. Comparators

#### 1. *Replacements*

Mr. Collins and Mr. Sheppard believe that Jeffrey Whitley, who is under 30 years old, filled both of their positions. (Collins Dep. at 75-77, 79-80; Sheppard Dep. at 13-14.) Mr. Whitley testified that he temporarily filled a foreman position in the weeks after Mr. Collins' and Mr. Sheppard's departure, but that his tenure "expired." (Whitley Dep., Doc. 48-9, at 13.) After discussions with the management team, Mr. Whitley appears to have been reinstated as a foreman. (Id.) Mr. Middleton and Mr. Wynn testified, however, that Mike Boatright, who is at least older than Mr. Collins, filled the empty positions. (Collins Dep. at 64, 76; Middleton Dep. at 77; Wynn Dep., Doc. 48-10, at 12.)

#### 2. *Disparate Discipline*

Plaintiffs allege that OREMC issued lighter punishments to the younger crew members after the Harriet's Bluff contact incidents. As to the December 2011 incident, Mr. Wynn — a crew leader in his late twenties or early thirties — was not

disciplined in any way when the line "got away" from him in the bucket and contacted an energized conductor. (Proctor Dep. at 46-47; Sheppard Dep. at 63; Wynn Dep. at 9-10.) After the March 2012 incident, Jody Miller, a crew leader in his late twenties, received a written reprimand. (Collins Dep. at 90; Proctor Dep. at 48-49; Thomas Dep., Doc. 37, at 5, 11, 18.) Andy Thomas, a twenty-something lineman and the individual navigating the bucket when it contacted the live line, was suspended for two or three days. (Id.) Plaintiffs assert that, based on OREMC's safety manual, crew leaders and supervisors have identical responsibilities on the worksite to ensure safety. (Pls.' Sur-Reply, Doc. 53, at 3; see also Proctor Dep. at 43-44 & Ex. 1, § 101(A).)

Mr. Collins and Mr. Sheppard also assert that "this case contains uncontroverted testimony from several witnesses that younger employees were involved in serious incidents which were potentially dangerous, and were not disciplined in any way." (Pls.' Resp., Doc. 44, at 8.) First, a few months after Mr. Whitley became a foreman, "a line blew up" in the hands of one of his crew members. (Collins Dep. at 89-90.) OREMC disciplined neither Mr. Whitley nor the crew member, Todd Gay. (Id.; Proctor Dep. at 46.) Second, at some point in time, Mr. Wynn and Mr. Spense were in a bucket truck maintaining wires when Mr. Spense

placed a tool to his chin, which was "extremely dangerous." (Wynn Dep. at 13.) Again, OREMC did not issue discipline. (Id.)

## II. STANDARD OF REVIEW ON SUMMARY JUDGMENT[1]

The Court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259, 1260 (11th Cir. 2004); FED. R. CIV. P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted). "[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating that there is indeed

---

[1] The Clerk gave the parties appropriate notice of the motion for summary judgment and informed Plaintiffs of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 34.) Thus, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), were satisfied.

a genuine issue as to the material facts of its case. Clark v. Coats & Clark, Inc. ("Clark I"), 929 F.2d 604, 608 (11th Cir. 1991). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. Matsushita, 475 U.S. at 587. The Court must also avoid weighing conflicting evidence. Anderson, 477 U.S. at 255; McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 934 (11th Cir. 1987). Nevertheless, the non-moving party's response to the motion for summary judgment must consist of more than conclusory allegations, and a mere "scintilla" of evidence will not suffice. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990); Pepper v. Coates, 887 F.2d 1493, 1498 (11th Cir. 1989).

### III. DISCUSSION

Mr. Collins asserts that OREMC's need "to get rid of some people" was the cause of his suspension and termination. (Collins Dep. at 58.) Based on (1) the company's "early-out" retirement program, (2) a compliment about his job performance

15

that he received from Mr. Thornton months before the Harriet's Bluff incidents, and (3) his own personal assessment that he in no way committed safety infractions, Mr. Collins contends the real reason OREMC ultimately terminated him was his age. (Id. at 64-88.) Similarly, Mr. Sheppard asserts that OREMC "needed to get somebody off the books" and that because he neither broke a safety rule nor was insubordinate, his "[termination] had to be something with age." (Sheppard Dep. at 31-35.) Mr. Sheppard points to (1) the company's elimination of pensions for new hires and miscellaneous benefits for all employees, such as "big dinners;" (2) his own pension, which was "starting to make good money;" and (3) his 24 years of experience as evidence of OREMC's discriminatory motive. (Id.) Finally, Mr. Sheppard's administrative complaint indicates that Mr. Proctor's "jealousy" of the respect Mr. Sheppard garnered from his crew may have played a role in OREMC's termination decision. (Id. at 23-25; Ex. 4.) Indeed, when asked whether his relationship with Mr. Proctor factored into the decision to terminate his employment, Mr. Sheppard responded, "I don't think it helped." (Id. at 23-25; Ex. 4.)

A.   **Legal Standard under the ADEA**

Under the ADEA, it is "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his

16

compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may "establish a claim of illegal age discrimination through either direct evidence or circumstantial evidence." Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Comm'rs, 512 F.3d 1296, 1300 (11th Cir. 2008). To evaluate ADEA claims that are based upon circumstantial evidence of discrimination, as is the case here, courts employ the McDonnell Douglas burden-shifting framework. Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000). Under this framework, a plaintiff must first establish a prima facie case of discrimination by showing that he was (1) within the statute's protected class, (2) subjected to an adverse employment action, (3) qualified to do the job, and (4) suffered from disparate treatment because of his membership in the protected class. Caraway v. Sec'y, U.S. Dep't of Transp., 550 F. App'x 704, 709 (11th Cir. 2013) (citing Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002). "To establish the disparate treatment element of the prima facie case, a plaintiff may point to a similarly situated comparator who was not discriminated against." Id. (citing Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004)). "To establish disparate treatment in this way, "[t]he comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Id. A

17

plaintiff may also satisfy this element by putting forth evidence that he or she was replaced by or otherwise lost a position to a younger individual. Chapman, 229 F.3d at 1024.

If a plaintiff successfully establishes a prima facie case, the burden of production shifts to the employer to articulate some legitimate non-discriminatory reason for its action. Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997). This intermediate burden is "exceedingly light," and once the employer offers a justification, the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason for its actions is pretextual. Ward v. Gulfstream Aerospace Corp., 894 F. Supp. 1573, 1578 (S.D. Ga. 1995) (citing Batey v. Stone, 24 F.3d 1330, 1334 (11th Cir. 1994)). At all times, however, the plaintiff retains the ultimate burden of persuasion: he or she must show that age was the "but for" cause of the challenged employment action. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176-77 (2009). "The employer either acted 'because of' the plaintiff's age or it did not." Mora v. Jackson Mem'l Found., Inc., 597 F.3d 1201, 1204 (11th Cir. 2010) (citing Gross, 557 U.S. at 176). Indeed, a claim that "mixed motives" precipitated the employer's action will not suffice. Id.

**B. Analysis**

Plaintiffs have stated a prima facie case: both Mr. Collins and Mr. Sheppard (1) are members of the protected class; (2) were qualified, with approximately twenty years of service each; (3) were subject to an adverse employment action — here, termination; and (4) OREMC filled Plaintiffs' positions, at least in part, with an individual who was in his late twenties.[2]

The Court also concludes that OREMC's proffer of legitimate non-discriminatory reasons for Plaintiffs' terminations — a pattern of safety infractions and/or insubordination — eliminates any presumption of discriminatory intent. Mr. Middleton, Mr. Page, Mr. Proctor, and Gary Strickland, OREMC's Safety Director, elaborated on the purported safety deficiencies, attitude problems, and lack of leadership at length by way of deposition testimony. The Court therefore finds such reasons amply sufficient to meet OREMC's minimal burden of production at this stage.

Thus, to avoid summary judgment, Plaintiffs must introduce significantly probative evidence showing that the asserted reasons for their respective terminations are merely pretext for discrimination. "The burden of proving pretext merges with [a]

---

[2]    It is unclear to the Court if one or two individuals filled Plaintiffs' positions.  If both Mr. Whitley *and* Mr. Boatwright replaced Plaintiffs, it is possible that one plaintiff has not set forth a prima facie case because Mr. Boatwright was at least older than Mr. Collins.  The Court need not resolve this matter, however, because neither plaintiff has provided sufficient evidence to raise a genuine factual issue as to pretext.

plaintiff's ultimate burden of proving that age was a determining factor in his discharge, and it can be met by showing that a discriminatory reason more likely than not motivated the employer's decision, or by discrediting the employer's proffered explanation." Clark v. Coats & Clark, Inc. ("Clark II"), 990 F.2d 1217, 1228 (11th Cir. 1993). Plaintiffs must "meet the proffered reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006). Indeed, federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decision process, no matter how mistaken the firm's managers, the ADEA does not interfere." Chapman, 229 F.3d at 1030 (citing Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)). Thus, Plaintiffs must produce sufficient evidence to allow a reasonable finder of fact to conclude that OREMC's articulated reasons for terminating Plaintiffs are not believable. They may do this by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered explanations. Brooks, 446 F.3d at 1163. "A reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'"

Id. (emphasis added) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

Plaintiffs have failed to carry this burden. Indeed, Plaintiffs' response brief addresses pretext in one paragraph, instead rebutting arguments related to the prima facie case that Defendants already conceded. (See Pls.' Resp. at 12; Def.'s Br., Doc. 26, at 9.) Upon review of the record and Plaintiffs' Sur-Reply,[3] it appears that Plaintiffs attempt to establish pretext by three separate means: (1) vigorously contesting that their conduct violated specific, enumerated safety rules and/or company policies; (2) comparator evidence; and (3) referring to OREMC's early retirement program and other pension-related matters. For reasons more fully developed below, none are sufficient to prove pretext.

### 1. Plaintiffs' Challenges to the Grounds Underlying the Cited Safety Violations

Plaintiffs repeatedly argue that they did not violate any safety rules, particularly with respect to the March 2012

---

[3] Plaintiffs filed a sur-reply brief that expands their factual argument as to pretext. (Doc. 53.) Defendants have moved to strike the sur-reply because Plaintiffs failed to seek the Court's permission to file it and the brief itself "is repetitive and serves no constructive purpose." (Doc. 54, ¶ 3.) In contrast to Plaintiffs' Statement of Material Facts and response brief, the sur-reply makes thorough citations to the record, and the Court thus considers it for that purpose. Defendants are correct, however, that it largely is repetitive and offers no new legal theories. In light of this lack of prejudice to Defendants, and the fact that Plaintiffs' claims fail as a matter of law in spite of the additional citations, see infra, the Court **DENIES** Defendant's Motion to Strike.

incident at Harriet's Bluff that spurred their final suspensions and terminations. Specifically, they jointly contend:

(1) the 2008 incident in which they falsified tags on equipment prior to an inspection helped the company (PSMF ¶¶ 47, 67);

(2) the alleged failure to hold a safety "tailgate" on site should be excused because the crew had worked at the Harriet's Bluff site for at least 10 months and thus were sufficiently familiar with the area (Pls.' Sur-Reply at 2);

(3) the March 2012 contact incident occurred because OREMC's new grounding procedure was "more challenging" and "unsafe," and "[m]anagement required them to use too many grounds" (Pls.' Sur-Reply at 2; PSMF ¶ 52);

(4) Mr. Thomas was the only worker who could have prevented the March 2012 contact incident and he accepted full responsibility (PSMF ¶ 61; Thomas Dep. at 18);

(5) OREMC's safety manual allowed for grounding or barricading, and it was safer to barricade the truck given the "challenging" new grounding procedure even though OREMC did not own all the proper equipment to construct a barricade (Pls.' Sur-Reply at 2-4; Middleton Dep. at 80-82);

(6) because there was no property damage or injuries as a result of the March 2012 contact incident and customers lost power only briefly, termination was inappropriate (Pls.' Resp. at 10, 12); and

(7) Plaintiffs' crew members "always felt safe" while working for them (PSMF ¶ 20).

Plaintiffs, however, cannot establish pretext by pointing fingers or disagreeing with the rules and procedures that OREMC had in place. Nor can Plaintiffs rebut OREMC's legitimate non-discriminatory reasons by merely asserting, in their opinions or those of non-decision maker subordinates, that they performed

their jobs well.  See Chapman, 229 F.3d at 1030 (noting that plaintiff cannot establish pretext by questioning the wisdom of her employer's reason as long as the reason is one that might motivate a reasonable employer); Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997) (explaining that the pretext inquiry is about the employer's perception of the plaintiff's performance, not the employee's own perceptions).

In most circumstances,[4] despite claiming that OREMC's proffered reasons have no basis in fact, Plaintiffs do not

---

[4]    Mr. Collins challenges his citation for failure to wear a safety vest. He testified, as did Mr. Whitley, that he temporarily removed the vest in order to put on a jacket as he prepared to leave the worksite because his crew had been called to address an outage elsewhere.  (Collins Dep. at 52-53; Whitley Dep. at 12-13.)  Mr. Collins admits, however, that Mr. Proctor saw him on the road without a vest.  (Collins Dep. at 52 ("I looked at [Jeff] and I said well, I guess Royce saw me without my vest on.  He'll probably write me up."); see also id. Ex. 7 ("I pulled up on the Job site . . . at 2:15pm. . . . Derek was not wearing a traffic vest and was in the travel lane picking up the cones.").)  He also disputes that he engaged in insubordinate or improper behavior when he yelled at Mr. Spense about who was entitled to use a specific work truck.  Mr. Collins claims he merely raised his voice to be heard over the truck's diesel engine, and he unequivocally denies receiving a warning or counseling that such "disrespectful" behavior would not be tolerated in the future.  (Id. at 45-46.)  Finally, Mr. Collins asserts that one road sign incident did not survive the grievance process, and thus the Court should not consider it.  (Pls.' Resp. at 8.)  The only evidence Mr. Collins cites — and the Court can find — to substantiate this assertion is the testimony of Mr. Thomas, which merely reflects that Mr. Collins engaged the union to address the write-up on sign usage.  (Thomas Dep. at 23.)  Mr. Thomas, however, did not know the resolution of the grievance process, stating only that "after we done our procedure he was able to come back to work."  (Id.)

Mr. Sheppard denies that he was insubordinate in either (1) failing to return to work when told or (2) failing to properly arrange a vacation day with his supervisor, Mr. Proctor.  It is not disputed that OREMC's procedure for taking leave was informal and that Mr. Sheppard, at minimum, informed Mr. Proctor of his intent to take a vacation day.  The parties do dispute the manner in which Mr. Sheppard expressed that intent: whether it was a request or a demand.  The Court, however, finds this "tone-of-voice" dispute to be immaterial.  Mr. Middleton testified that Mr. Sheppard's decision to take leave immediately after being suspended was not a wise course, a judgment with which Mr. Sheppard cannot quarrel.  See Brooks, 446 F.3d at 1163; Holifield, 115 F.3d at 1565.  Indeed, the Court finds that such a decision by a recently disciplined employee might motivate a reasonable employer to take

23

contradict the events that OREMC determined were disciplinary and/or safety issues such that "a reasonable factfinder [could] conclude that the proffered legitimate reasons were not what actually motivated [OREMC]." But cf. Keene v. Prine, 477 F. App'x 575, 581 (11th Cir. 2012) (quoting Combs, 106 F.3d at 1538) (finding the plaintiffs established pretext through their testimony, which "directly refute[d]" the defendant's accounts of unprofessional behavior, poor performance, insubordination, etc. purportedly underlying their terminations); Mora v. Jackson Mem. Found., Inc., 597 F.3d 1201, 1204 (11th Cir. 2010) (per curiam) (reversing grant of summary judgment because, where an employer and an employee testify oppositely as to the contents of a conversation, the outcome "depends on whose account of the pertinent conversations a jury would credit"); Munoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1345 (11th Cir. 2000) (finding employee testimony denying confrontation "directly contradicted" employer's testimony that he was fired for insubordinate behavior, "creating a factual conflict properly resolved by the jury").

---

further adverse action. In any case, Mr. Sheppard fails to adduce any evidence that age was the real reason for OREMC's discontent with his use of vacation.

More importantly, Plaintiffs fail to rebut head on that OREMC terminated their employment because of a *pattern* of safety violations and disciplinary issues. Thus, even assuming Plaintiffs effectively rebut one or more of the disciplinary infractions outlined in their termination notices, the Court will not extrapolate such discrete infirmities to invalidate the entire pattern of misconduct for which OREMC terminated them in light of the uncontroverted incidents described herein.

Neither Mr. Collins nor Mr. Sheppard denies that they altered the inspection tags in 2008 upon realizing that their testing gear was unavailable. Mr. Collins, in fact, does not rebut at all OREMC's assertion that he later *lied* about his involvement in that incident and did not confess until being confronted with incriminating evidence.[5] Neither Mr. Collins nor Mr. Sheppard deny that they were the foremen in charge of the Harriet's Bluff worksite in December 2011 and again in March 2012 during which two contact incidents occurred with 14,000 volt live wires. Mr. Collins does not deny that he failed to set up road signs in November 2011 because he did not have the signs on his truck that day. Mr. Collins also does not deny that in his haste, he failed to read the road signs on another occasion and improperly installed them. More importantly, Plaintiffs do not rebut OREMC's overarching concern: that the number of mishaps over the course of several months, combined with Plaintiffs' perceived dislike of and attitude toward some supervisors, was not becoming of "senior folks on the dirt." (Page Dep. at 35; Middleton Dep. at 63 (stating that Mr. Sheppard regularly was in "leadership positions" as foreman and, as such, he was responsible, more so than crew leaders, for his

---

[5]     Instead, Mr. Collins contends the Last Chance Agreement issued as a result of the incident expired after one year, at which point OREMC removed it from Mr. Collins' file. (PSMF ¶¶ 18, 46.) As Mr. Middleton explained, however, that the *agreement* expired does not mean that all evidence of the infractions disappeared too. (Middleton Dep. at 41.) The agreement merely limited the employees' and their union's rights under the grievance and arbitration procedures for that one year period if subsequent incident or citations arose. (Id.)

men); see also Collins Dep., Ex. 3, ¶ 4 (noting that Plaintiffs'
criticism of management in front of new employees was
inappropriate and potentially intimidating); Sheppard Dep., Ex.
3, ¶ 6 (same).)

Plaintiffs certainly, therefore, have not demonstrated that
OREMC's reasons are implausible, incoherent, or actually false.
See Chapman, 229 F.3d at 1030. OREMC — through Mr. Proctor, Mr.
Page, Mr. Strickland, and Mr. Middleton — consistently and
thoroughly articulated the proffered reasons for Plaintiffs'
terminations via testimony and in Plaintiffs' termination
notices. Cf. Keene, 477 F. App'x at 583 (finding, "most
notably," that none of the five reasons proffered for the
plaintiff's termination was ever provided to the Georgia
Department of Labor or the EEOC); Hurlbert v. St. Mary's Health
Care Sys., Inc., 439 F.3d 1286, 1298-99 (11th Cir. 2006)
(reversing grant of summary judgment on FMLA claim, in part,
because of evidence that the proffered reason for termination
was not given on separation notice or other termination
documents, and citing as evidence of pretext "an employer's
failure to articulate clearly and consistently the reason for an
employee's discharge"). Thus, although Plaintiffs may disagree
with OREMC's characterization of their behavior or the amount of
responsibility OREMC required them to share with others, their

dissent, without more, cannot create a fact issue for the jury on the issue of pretext.

### 2. Plaintiffs' Comparators Are Improper and Thus Cannot Be Used to Establish Pretext.

"When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, [the Court must] evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). A proper comparator is an employee outside of the plaintiff's protected class who is similarly situated to the plaintiff "in all relevant respects." Holifield, 115 F.3d at 1562. If the comparator is not similarly situated in all relevant respects, "the different application of workplace rules does not constitute illegal discrimination." Lathem v. Dep't of Children & Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999).

In determining whether a comparator is similarly situated to the plaintiff, the Eleventh Circuit has stated that "[t]he relevant inquiry is not whether the employees hold the same job titles." Id. Rather, "the quantity and quality of the comparator's misconduct must be nearly identical [to the plaintiff's] to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Burke-

*Fowler*, 447 F.3d at 1323 (citing *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).

### a. *Jeffrey Whitley, Foreman*

Plaintiffs assert that Jeffrey Whitley is a valid comparator. (Pls.' Sur-Reply at 5-6; Collins Dep. at 89.) Mr. Whitley, who allegedly filled Plaintiffs' positions, was involved in a safety incident for which OREMC issued *no* discipline: a few months after Mr. Whitley became a foreman, "a line blew up" in the hands of one of his crew members. (Collins Dep. at 89-90.) First, Plaintiffs did not report it, and there is no evidence before the Court showing that any supervisor or decision maker at OREMC was even aware that the incident occurred such that discipline *could* be issued. (Middleton Dep. at 75-76; Proctor Dep. at 46.) *Mercer v. Perdue Farms, Inc.*, No. 5:10-CV-324 CAR, 2012 WL 39342, at *6 (M.D. Ga. Jan. 9, 2012) ("Disparate discipline cannot be shown without first showing that the employer was aware of the comparator's misconduct.") (citing *Vickers v. Fed. Express Corp.*, 132 F. Supp. 2d 1371, 1380 (S.D. Fla. 2000); *Amos v. Tyson Foods, Inc.*, 153 F. App'x 637, 647 (11th Cir. 2005) (holding management must be aware of comparator's misconduct); *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1317 n.5 (11th Cir. 2003) (applying the same to a supervisor)).

Second, the Eleventh Circuit has held explicitly that experience is a valid factor for courts to consider in determining whether comparators are similarly situated "in all relevant respects." Beard v. 84 Lumber Co., 206 F. App'x 852, 857 (11th Cir. 2006) (holding that the plaintiff and his comparator were not similarly situated where the plaintiff had much more experience than the comparator); Edwards v. Niles Sales & Serv., Inc., 439 F. Supp. 2d 1202, 1216 (S.D. Fla. 2006) ("[The] difference in experience demonstrates that Plaintiff and [his comparator] were not similarly situated for purposes of Plaintiff's prima facie case."). Mr. Collins' own testimony reveals that Mr. Whitley had served as a foreman for a matter of months when the aforementioned incident occurred under his watch; Plaintiffs, on the other hand, had served in their roles as foremen for *years*. Plaintiffs provide no evidence as to Mr. Whitley's years of service, training, or disciplinary record.[6] (Collins Dep. at 90.) Thus, even if this Court found Mr. Whitley engaged in the same misconduct — what boils down to a failure of leadership or effective supervision of his crew — this Court will not second guess OREMC's employment decision to hold Plaintiffs, who had vastly more experience and documented disciplinary issues, to a higher standard. See Thompson v.

---

[6] Plaintiffs provide only an excerpt of Mr. Whitley's deposition. One other disciplinary incident appears here: fourteen lines of testimony about maintenance of a first-aid kit. (Whitley Dep. at 14.)

Tyson Foods, Inc., 939 F. Supp. 2d 1356, 1367-68 (M.D. Ga. 2013).

### b. *Jody Miller & Andy Thomas, Crew Leaders*

Plaintiffs further assert that Jody Miller and Andy Thomas are valid comparators based on their engagement in similar unsafe conduct. Both are under thirty and were present as members of Plaintiffs' crews at the Harriet's Bluff site during the March 2012 contact incident. Mr. Thomas, who actually maneuvered the bucket into the live electrical line, received a suspension for two or three days as a result of OREMC's investigation. Mr. Miller received a written reprimand. Plaintiffs depend heavily, if not solely,[7] on OREMC's safety manual to substantiate the comparison, specifically a single provision which imparts upon foremen *and* crew leaders the responsibility for "execution of the work in a safe manner" and the "job performance of all employees under their direction." (Pls.' Resp. at 6.) Plaintiffs thus argue that OREMC's failure to heed this provision and issue equal discipline to the younger crew leaders is evidence of unlawful discrimination against Plaintiffs.

---

[7] To the extent the Court can discern, the only other evidence relevant to the determination of whether Mr. Thomas is a proper comparator is Plaintiffs' suggestion that he was "certified" and that he worked for Pike Electric prior to joining OREMC. (See Middleton Dep. at 69.) Plaintiffs offer no evidence as to Mr. Miller's tenure, training, or disciplinary history.

Plaintiffs' contention that the safety manual provision means that crew leaders and foremen had the "same job responsibilities," however, is simply not true. Plaintiffs' own testimony indicates that there is a clear hierarchy within the crews: a group of crew leaders reported *to* Plaintiffs (Collins Dep. at 28-29); foremen are considered "overseer[s]" (<u>id.</u> at 25-26); and promotions through the ranks are regimented based on completion of certain training and apprenticeships (Sheppard Dep. 46-47). OREMC charged the *foremen* with leading pre-job briefings and delegating material sheets to get the jobs started. (Collins Dep. at 38-39.) Mr. Thomas and Mr. Miller, therefore, are not valid comparators on the basis of the material differences in the men's respective ranks and job responsibilities. <u>See</u> <u>Rioux v. City of Atlanta, Ga.</u>, 520 F.3d 1269, 1281 (11th Cir. 2008).

### c. *Steve Wynn, Crew Leader*

Plaintiffs also contend Steve Wynn is a valid comparator based on his engagement in similar unsafe conduct. (Pls.' Sur-Reply at 5-6.) First, Mr. Wynn received no discipline after the tail of an energized wire "got away from him," ultimately causing the December 2011 contact incident at Harriet's Bluff and attendant burn damage to a vehicle's tires. At the time, Mr. Wynn was a crew leader in his late twenties or early thirties. (Pls.' Resp. at 8 (age 36); Sheppard Dep. at 63 (age

31

"late twenties, early thirties").) Then at some other unspecified point in time, Mr. Wynn and Mr. Spense were in a bucket truck maintaining wires when Mr. Spense placed a tool to his chin, which was "extremely dangerous." (Wynn Dep. at 13.)

Notwithstanding the material differences in Mr. Wynn's rank and responsibilities as crew leader, Mr. Proctor explicitly testified that even though Mr. Wynn underwent the same training as Plaintiffs, OREMC did not think it was appropriate to discipline Mr. Wynn after the first incident because he had little experience and "there was confusion" about the procedures Mr. Wynn was tasked with completing. (Proctor Dep. at 47.) Plaintiffs offer no evidence as to how long Mr. Wynn held the position of crew leader to contradict OREMC's assessment that the parties had disparate experience. Plaintiffs also fail to show that Mr. Wynn had similar disciplinary history and/or perceived attitude issues such that the 2011 contact incident *should* have been "one more straw on the camel's back." (Page Dep. at 44.)

As to the second cited incident, again, there is no evidence before the Court identifying when it occurred, what Mr. Wynn's title or rank was at the time, whether Mr. Wynn had any authority over or responsibility for Mr. Spense's actions, or whether any supervisor or decision maker at OREMC was even aware that the incident occurred such that discipline *could* be issued

to anyone. Mr. Wynn could only speculate about Mr. Proctor's knowledge of the incident, and Plaintiffs did not ask anyone else at OREMC about it. (Wynn Dep. at 13 ("Q: Do you know if Royce Proctor knew about this event? A: I don't know that he did. I would only speculate that he did. I would be pretty sure that he did.").) For these reasons, the Court is not persuaded that Mr. Wynn is a proper comparator.

### 3. OREMC's Early Retirement Program and Mr. Sheppard's Pension Status

Plaintiffs emphasize that in 2011 and 2012, OREMC offered "early-out" retirements to employees who were at least 62, and "the young linemen were aware" of this program. (Collins Dep. at 70-72; Pl.'s Resp. at 9.) OREMC initiated the program as a cost-saving measure in response to decreased revenue growth, which the company attributed in large part to the downturn in the construction industry beginning in 2008. (Crews Dep. at 36; Middleton Dep. at 24-26.) According to Mr. Crews, "when the economy went down, [OREMC] had a lot of people there[,]" there was "no work for them," and "so some of the older employees were given an option" to retire early. (Crews Dep. at 34.) Only four employees accepted. (Id.) OREMC extended more offers, "but [the employees] didn't really want to leave, and [OREMC] didn't really want to lose them." (Id. at 34-35.) Plaintiffs

appear to offer this evidence to show that OREMC had a "pattern" of removing older workers from the workplace.

The Court finds that the mere existence of OREMC's voluntary early retirement program is not probative of — or even creates an inference of — age discrimination against Plaintiffs. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1082 (11th Cir. 1990) (finding the plaintiffs' evidence that the defendant made evaluations of the number of employees eligible for voluntary early retirement as part of a reduction-in-force plan to be at best "merely colorable and not significantly probative" because "[t]o accomplish a [reduction-in-force] by natural attrition and voluntary early retirement is lawful" and none of the proffered evaluations "relate[d] to specific actions taken toward [the] plaintiffs because of [their] age); Arnold v. Rayonier, Inc., 181 F.R.D. 549, 556 (S.D. Ga. 1998) (finding no error in the exclusion of evidence that 24 employees, all over the age of 40, voluntarily accepted early retirement packages shortly before the plaintiff's termination because it was "irrelevant" in the absence coercion of other evidence of discriminatory intent).

An employer does not violate the ADEA merely by offering its employees the option of early retirement. Brooks v. Bellsouth Telecomm's, Inc., 164 F.R.D. 561, 566 (N.D. Ala. 1995), aff'd, 114 F.3d 1202 (11th Cir. 1997) ("Voluntary early

retirement plans are not per se illegal under the ADEA."); McCorstin v. U.S. Steel Corp., 621 F.2d 749, 755 (5th Cir. 1980)[8] ("Permissive early retirement is a laudable attempt to provide security for those who are unable or disinclined to continue to work to the mandatory or normal time for retirement. . . . [An] employee may be offered early retirement as an alternative to discharge, but availability of the plan itself may have no bearing on the decision."); 29 U.S.C. § 623(f)(2)(B)(ii) (stating that it is not unlawful for an employer "to observe the terms of a bona fide employee benefit plan that is a voluntary early retirement incentive plan consistent with the relevant purpose[s]" of the ADEA). In this case, Plaintiffs make no allegation that OREMC coerced older employees to accept the early retirement option, and Mr. Crews' testimony suggests the contrary: that overall, OREMC wished to keep the employees to whom it offered the option, and in the end, the early retirement "program" had minimal effect on OREMC's workforce because so few accepted. The mere fact, then, that OREMC offered an early retirement plan fails to show its intent to eliminate older employees — including Plaintiffs — *because of their age*.

Furthermore, Mr. Sheppard intimates that because his "pension was increasing, as was [his] insurability," OREMC chose

---

[8] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (holding Fifth Circuit decisions made on or before September 30, 1981, are binding precedent in Eleventh Circuit).

to eliminate him. (Sheppard Dep. at 32 & Ex. 4 at 2.) In 2008, however, the Supreme Court reaffirmed its prior holding that discrimination on the basis of pension status is not unlawful under the ADEA, so long as it is not a "proxy for age." Ky. Ret. Sys. v. EEOC, 554 U.S. 125, 141-43 (2008) (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 613 (1993)). In other words, pension evidence occasionally may be relevant "where the employer is shown consciously to equate pension status with age." Biggins v. Hazen Paper Co., 111 F.3d 205, 211 (1st Cir. 1997); see also Dilla v. West, 4 F. Supp. 2d 1130, 1141-42 (M.D. Ala. 1998), opinion corrected, 31 F. Supp. 2d 1347 (M.D. Ala. 1999), aff'd, 179 F.3d 1348 (11th Cir. 1999) ("[A]ctionable age discrimination may be found when the employer 'targets employees with a particular pension status on the assumption that these employees are likely to be older,' but not where it is the pension status alone, with its attendant financial consequences, that was the employer's sole focus." (citing Hazen Paper, 507 U.S. at 612-13)).

Without a similarly situated comparator or any other sufficient circumstantial evidence, the Court cannot conclude that OREMC exploited Mr. Sheppard's pension status to mask its true reliance on his age or age-based stereotypical thinking in terminating him. See Hazen Paper, 507 U.S. at 612. Indeed, upon review of the record and without the benefit of any

36

argument at all by Mr. Sheppard on this subject, it appears to the Court that pension status played no role in OREMC's decision. Accordingly, no reasonable juror could find that evidence of the early retirement program and Mr. Sheppard's pension status establishes pretext.

## IV. CONCLUSION

"[T]he *sine qua non* of a claim for age discrimination . . . is that the employer unlawfully relied upon 'inaccurate and stigmatizing stereotypes' in carrying out the challenged employment action." Dilla, 4 F. Supp. 2d at 1141 (citing Hazen Paper, 507 U.S. at 611.) This problem disappears when the employer is wholly motivated by factors other than age, including education, experience, references, and financial considerations – even those that may have some relationship to the employee's age. Id.; Wright v. Sutherland, 187 F.3d 1287, 1289 (11th Cir. 1999). That is the case here: there is ample credible evidence to conclude, and this Court so finds, that OREMC grounded its decision to terminate Plaintiffs in what it perceived to be a pattern of sub-standard behavior — in safety, leadership, and attitude. It is not enough for Plaintiffs to raise a suspicion regarding an improper motive or to cast doubt on these justifications; they must rebut them and present a sufficient showing that a *discriminatory animus* motivated the action. Rioux, 520 F.3d at 1278 (citing Chapman, 229 F.3d at

1024-25); Brooks, 446 F.3d at 1163; see also Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1117 (1st Cir. 1993). Put simply, Plaintiffs' evidence fails to show that they would not have been fired but for being more than 40 years old, and OREMC is entitled to judgment as a matter of law.

Upon the foregoing, the Court **GRANTS** Defendant Okefenoke Rural Electric Membership Corporation's Motion for Summary Judgment (Doc. 25) and **DENIES** Defendant's Motion to Strike (Doc. 54). The Clerk is **DIRECTED** to close this case.

**ORDER ENTERED** at Augusta, Georgia, this _29th_ day of December, 2014.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA